**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  09-00363-01-CR-W-NKL |
| | ) | |
| JEFFREY THOMPSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S  SENTENCING  MEMORANDUM**

**I.  INTRODUCTION**

Sentencing is scheduled for Wednesday, March 9, 2011, at 4:00 p.m., before United States District Court Judge Nanette Laughrey.  As more fully explained below, the Government recommends that the Court impose a sentence of 78 months' imprisonment, waive imposition of a fine, enter a mandatory restitution order of $6,668,580 as a condition of supervised release, and enter a mandatory order imposing a $300 special assessment.

The defendant's plea agreement requires payment of the $300 special assessment at the time of sentencing and requires that he have completed and submitted to the United States Attorney's Office financial disclosure forms.  The defendant's failure to make this payment and/or to complete and submit the forms would constitute a breach of the plea agreement, in which case the United States reserves the right to be released from its obligations under the plea agreement.  Assuming the plea agreement is not breached, the United States will request the low end of the defendant's advisory Guidelines range.  As probation is not authorized in any of the three counts, imprisonment is not only justified by the defendant's conduct, it is required.

Thompson was President of Hume Bank from 2001 until August 2007, when he resigned upon discovery by the bank's Board of Directors (Board) of his crimes. Thompson's deceptive concealment of bad loans caused the Missouri Division of Finance (MDOF) to close Hume Bank for insolvency on March 7, 2008. Thompson made and administered several loans, many to family members, which he did not bother to collect. Rather than work to collect the loans or seize the collateral, Thompson engaged in a series of lies to cover up the loans and make it appear as though Hume Bank was sound. Thompson lied to the bank's Board, the MDOF, the Federal Deposit Insurance Corporation (FDIC), and to bank customers.

Thompson was also Information Technology Director of Hume Bank, and he made full use of his computer access. In fact, the MDOF has now instituted the "Thompson Rule" in which bank officers cannot be the Information Technology Directors of their banks. (PSR, ¶¶ 7-8.) Typically, toward the end of each quarter, Thompson would make changes in the loan maintenance reports (LMRs) to conceal problem loans. The altered loan records are summarized quarterly into Call Reports, which are reviewed by the FDIC. Additionally, the information from the LMRs is used in compiling past due reports, which are reviewed by the Board. Thompson would change past due interest, past due principal, and maturity dates. A forensic accounting report prepared in October 2007 revealed that from January 1, 2004, to August 31, 2007, past due interest was reduced to zero 1,460 times and past due principal was reduced to zero 1,584 times. Only a few of these changes were supported by the proper paperwork in loan files (loan modification agreements), and 57% of the changes were made by the user name "Jeff." (PSR, ¶ 8.)

2

The vast majority of the changes Thompson made were before quarterly reports were filed with the FDIC. All banks are required to file quarterly financial and other information with the FDIC. These reports are named Report of Condition and Report of Income, commonly known as Call Reports. The information is extensively used by bank regulators in the daily offsite bank monitoring activities. In almost all cases, no written extensions or modification agreements for the loans were in bank files. Not only were the Call Reports submitted to the FDIC, they were reviewed by the Board, and used in preparing separate past due reports and watch lists for the Board. Thompson typically made the following changes to loan accounts: next payment due date (extended); date of maturity (extended); term in months (extended); 30-59 days delinquent (changed to zero); 60-89 days delinquent (changed to zero); times delinquent 1-29 (changed to zero); times delinquent 30-59 (changed to zero); times delinquent 60-89 (changed to zero); times delinquent 90+ (changed to zero); past due interest (changed to zero); and past due principal (changed to zero). (PSR, ¶¶ 13, 15, 17, 18, 20.)

Thompson also filed false Officer's Questionnaires with the FDIC. The questionnaires asked if loans had been extended without full collection of interest or by adding unpaid interest to the loan (capitalization of interest), and he falsely answered "no" to these questions. He also failed to disclose nominee loans made to his father-in-law and mother, from which Thompson personally benefitted. Thompson bought an RV with the loan money made to his father-in-law, and used the money loaned to his mother for the farm which Thompson partially owns. Many, but not all, of the problem loans were to relatives of Thompson. According to the borrowers, some of the loan extensions with the borrower's name on them were forgeries. (PSR, ¶ 9.)

3

Thompson also used the bank credit card to make personal purchases, which he did not reimburse. From 2004 - 2009, Thompson incurred personal charges on the bank credit card of approximately $12,098.57. Personal purchases were determined by giving the benefit of the doubt to defendant, and by interviewing Board members about official business trips. For example, Thomas Barr, the owner of the bank and also a Board member, stated that no hotel charge would be justified unless it was for bank business, and which could have been only to St. Louis for meetings with Board members, as 90% of bank business was conducted within a fifty-mile radius of Hume, Missouri. A sample of the personal charges Thompson made on the bank credit card were: personal trips to Las Vegas and Florida; $720 for a limousine in Lawrence, Kansas; and $323 for purchases made at Bath&Body. (PSR, ¶ 10.)

Thompson's conduct came to light in July and August 2007, during an MDOF examination of the bank. On August 9, 2007, there was a Board meeting which also included Thompson and the state bank examiners. There, for the first time, Hume Bank Board members were informed that Thompson had altered bank records, deleted past due histories, reduced interest rates so that very little interest accrued on loans, and that problem loans were not reported as they should have been on the Watch List; in short, that Thompson had violated bank policy and state and federal law. Board members said they would ask for Thompson's resignation in ten days, at which point Thompson left the meeting. Thompson lost his bonding as a bank officer, and did resign in August 2007. (PSR, ¶ 11.)

4

## II. SENTENCING RECOMMENDATIONS

### A. Guideline Disputes

There are no unresolved Guidelines disputes. However, Thompson did make a general

objection to the PSR:

> Though Mr. Thompson agreed that the dismissed counts of the indictment may be
> used in calculating the offense level pursuant to U.S.S.G. § 1B1.3(a)(2), he
> objects to the inclusion of the above paragraphs [¶¶13-26] in the pre-sentence
> report on the ground that the 'relevant conduct' does not alter the agreed
> guidelines range as set forth in the plea agreement. Specifically, the conduct
> alleged in the dismissed counts does not raise (or lower) the offense level beyond
> what was agreed to in the plea agreement. Consequently, the Court does not need
> to consider the conduct alleged in the dismissed counts to accurately calculate the
> applicable guidelines range.

There are two problems with Thompson's objection. The first problem is that his

objection is general rather than specific. "[U]nless a defendant objects to a specific factual

allegation contained in the PSR, the court may accept that fact as true for sentencing purposes."

*United States v. Lee*, 570 F.3d 979, 982 (8th Cir. 2009) (quoting *United States v. Moser*, 168

F.3d 1130, 1132 (8th Cir. 1999)). Thompson's objection lacks the specificity to require the

Government to substantiate the PSR findings. "Indeed, the district court is entitled to rely on

facts in the PSR when the defendant "object[s] not to the facts themselves but to the PSR's

recommendation based on those facts." Such a "summary objection" fails to "alert the

Government as to which specific facts it need[s] to substantiate at the hearing."" *Lee*, 570 F.3d at

982 (quoting *Moser*, 168 F.3d at 1132 and *United States v. Razo-Guerra*, 534 F.3d 970, 976 (8th

Cir. 2008)).

The second problem with Thompson's objection is that he appears to want this Court to

sentence him without all the information regarding his offenses. He will no doubt be asking for a

downward variance from the Guidelines range, which is an easier argument for him to make if

his criminal conduct is limited and sanitized, so that the full range of his crimes is not considered by this Court. Thompson's desire, while understandable, is contrary to federal law. 18 U.S.C. § 3661 provides: "No limitation shall be placed on the information concerning the background, character, and conduct a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Expanding upon the above statute, U.S.S.G. § 1B1.4 provides: "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character, and conduct of the defendant, unless otherwise prohibited by law."

This Court is not even restricted to the information in the PSR. Since the fullest information possible concerning the defendant's life and characteristics is essential to a judge's selection of an appropriate sentence, sentencing judges have "'not [been] restricted to evidence derived from the examination and cross-examination of witnesses in open court but may, consistently with the Due Process Clause of the Fourteenth Amendment, consider responsible unsworn or 'out-of-court' information relative to the circumstances of the crime and to the convicted person's life and characteristics.' *Williams v. Oklahoma*, 358 U.S. 576, 584, 79 S. Ct. 421, 426, 3 L.Ed.2d 516 (1959)." *United States v. Wise*, 976 F.2d 393, 398 (8th Cir. 1992). Thompson's objection should be summarily denied.

**B.      Recommended Sentence of Imprisonment and Supervised Release**

The plea agreement allows either party to argue for a sentence outside the advisory Guidelines range. (Plea Agreement, docket entry, at ¶ 6, pp. 4-6.) However, because defendant pled guilty to class 'B' felonies, he cannot receive probation, by statute. 18 U.S.C. § 3561(a)(1).

Case 4:09-cr-00363-NKL   Document 47   Filed 02/28/11   Page 6 of 12

Based on the statutory requirement for a prison sentence and the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States recommends that the court impose a sentence of 78 months, the low end of the advisory Guidelines range, followed by 5 years of supervised release, and mandatory restitution.

### 1. The History and Characteristics of the Defendant

The defendant had a good job, a good family, and no financial troubles when he elected to deceive federal and state bank examiners, and his Board of Directors, to cover up bad loans he made to friends and family members, and when he elected to steal from the bank. (PSR, ¶¶ 48-50, 57). Although the defendant may present letters from friends and family members which no doubt will state that they love him and that he is 'otherwise' a good person, that does not change the fact that for no reasons other than laziness and greed, he ran a federally insured bank into the ground. The fact that his crimes went on, uninterrupted, for years, demonstrates that defendant's conduct was not aberrant behavior for him. He did not stop his massive deception and theft until he was caught. (PSR, ¶¶ 7-12.)

Thompson claimed he made the changes in the LMRs so that he could better collect the loans and work with the borrowers. This was false: he neither attempted to collect the loans nor did he work with the borrowers. A banker who works with borrowers would: talk with the borrowers to find out what the problem was; make mutually agreed-upon loan modifications; re-structure the debt; or increase or add collateral to secure the loan. Thompson did none of these. Instead he: had borrowers sign blank modification agreements which he then used to make unreported loans capitalizing interest; forged borrowers' names to notes; and most commonly, falsely changed the loan account status. Thompson made the changes before the quarterly

reports; the timing shows his intent was to deceive bank examiners rather than to work with borrowers.

While there is no prior criminal history for this defendant, that fact is taken into account in his Guidelines calculation, and there is nothing in his personal characteristics to justify a departure therefrom. His laziness, incompetence, and greed do not justify, excuse, or mitigate the long-term crimes he committed. Accordingly, defendant's history and characteristics support a sentence at the low end of the advisory Guidelines range.

## 2. The Nature and Circumstances of the Offense

The banking system in the United States relies on federally insured deposits, so that the United States does not face the banking panics that in the past wiped out depositors' life savings and plunged the country into depression, as in the 1930's and earlier decades. Bankers know that bank examiners, who work on behalf of those who insure the deposits of that bank, must be provided truthful and complete information. Effective bank examination is the very bedrock of federally insured deposits and institutions. Thompson was the highest officer of the bank and a fiduciary of the bank's deposits. Instead of providing any assistance whatsoever to bank examiners and his own Board, Thompson did everything he could to thwart this system, all to further his own greed and laziness. His actions resulted in a loss to the FDIC of over $5 million, and a loss to the bank's owner, Thomas Barr, of $1.5 million.

The extent of Thompson's massive deception and embezzlement, which only continued and increased over time, all caused by his desire to provide benefits to himself and his relatives at the bank's expense while doing as little actual work as possible, supports a sentence within the Guidelines range, especially considering the abuse of his position and the consequences of his

8

actions. The Guidelines range is high because of the great harm Thompson caused, and he should be held to account fully for that harm.

Thompson may argue that he should be sentenced below the advisory Guidelines because did not embezzle/steal the entire loss, over $6 million, for his own benefit. It is true that he did not personally profit to the full extent of the loss he caused. However, he did personally profit, even beyond the credit card theft he engaged in and the nominee loans he made and failed to disclose. He kept his job as bank president while doing very little legitimate work - with that job he made a good salary, among the highest in Hume, Missouri, and he enjoyed the prestige that came with the job. Plus he got to benefit friends and relatives at the ultimate expense of the FDIC, by making and not collecting on many of the loans. Thompson engaged in his massive deception to benefit himself, and as the former bank president, he should be held accountable.

### 3. The Need to Afford Adequate Deterrence to Criminal Conduct

Defendant committed prolonged, serious crimes that caused the complete failure of a financial institution in the Western District of Missouri. Of course, while committing this crime, Thompson must have thought he wouldn't be caught, and that even if he was caught, he would escape serious punishment. Defendant and other potential white collar criminals should know that if they commit a crime and get caught, they will not escape with an apology, however sincere, and a slap on the wrist in the form of some minimal sentence. A sentence at the low end of the Guidelines range is necessary to adequately deter this defendant and others. If federal insurance is to be effective, those bankers like Thompson, who work to defeat bank examiners and thereby cause great losses, must face serious consequences for their actions. This is so

9

especially for a bank president, who holds the ultimate responsibility for accurately reporting the bank's condition.

### 4. The Need to Avoid Unwarranted Sentencing Disparities

A sentence at the low end of the advisory Guidelines range would avoid unwarranted sentence disparities. As the majority of criminal defendants in both the United States and the Eighth Circuit are sentenced within their advisory Guidelines range,[1] and over half of defendants convicted of fraud are sentenced within their advisory Guidelines range,[2] a sentence of 78 months' imprisonment would avoid an unwarranted sentencing disparity between this defendant and others similarly situated.

## C. Recommended Sentence for Monetary Penalties

### 1. Restitution

The defendant's crimes created a financial loss to the FDIC and Thomas Barr; thus the United States seeks imposition of a mandatory restitution order under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, in the amount of $5,168,580 to the FDIC, and $1,500,000 to Thomas Barr. (PSR, ¶ 73.) The Government recommends that the Court impose this as a condition of supervised release.

---

[1] United States Sentencing Commission Preliminary Quarterly Data Report: 54.6 % of defendants nationwide and 53.2 % of defendants in the Eighth Circuit were sentenced within their Guidelines Range from October 1, 2009, through September 30, 2010 (Table 2).

[2] United States Sentencing Commission Preliminary Quarterly Data Report: 54 % of defendants convicted of fraud nationwide were sentenced within their Guidelines Range from October 1, 2009, through September 30, 2010 (Table 3).

## 2. Fine

In light of the defendant's financial situation and the need for financial restitution, the United States does not object to the Court waiving imposition of a fine.

## 3. Special Assessment

Because the defendant was convicted of three counts, imposition of a $300 special assessment is required.  The defendant's plea agreement requires payment of the $300 special assessment at the time of sentencing.

## III.  CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to 78 months' imprisonment, 5 years' supervised release, and order him to pay restitution.

Respectfully Submitted,

Beth Phillips
United States Attorney

By      */s/ Kathleen D. Mahoney*

Kathleen D. Mahoney #38828
Assistant United States Attorney
Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri 64106
(816) 426-3122

11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on

February 28, 2011, to the CM-ECF system of the United States District Court for the Western

District of Missouri for electronic delivery to all counsel of record.

*/s/ Kathleen D. Mahoney*

Kathleen D. Mahoney
Assistant United States Attorney

12